## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROZ SAEDI, individually and on behalf of all others similarly situated,<br><br>            Plaintiffs,<br><br>v.<br><br>COTERIE BABY, INC.,<br><br>            Defendant. | Case No. 1:24-cv-3893<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiff Roz Saedi, individually and on behalf of all others similarly situated, ("Plaintiff") brings this Class Action Complaint against Defendant Coterie Baby, Inc. ("Coterie" or "Defendant") and upon personal knowledge as to Plaintiff's own acts and experiences, and on information and belief as to all other matters based on an investigation conducted by counsel, complain and allege as follows:

## NATURE OF THE ACTION

1.      This is a civil class action brought by Plaintiff on behalf of all consumers who purchased diapers from Defendant ("Coterie Diapers" or "Products").

2.      Defendant designs, formulates, manufactures, markets, advertises, distributes, and sells Coterie Diapers to consumers throughout the United States.

3.      Defendant's Products are sold on its website, as well as at various online and brick-and-mortar retailers.

1

4.      Consumers, including Plaintiff, pay a premium for Coterie Diapers compared to cheaper alternatives because consumers, including Plaintiff, prefer a safer, non-toxic diaper to use on their infants and small children.

5.      Defendant differentiates itself in the highly competitive diaper market by advertising and labeling its products as "free from harmful chemicals." Defendant tells consumers that "[i]f any chemical may be considered toxic, or is associated with health risks, you won't find it in our diapers."

6.      Through its uniform, widespread, nationwide advertising and labeling, Defendant has led consumers to believe that Coterie Diapers are entirely free of harmful chemicals.

7.      One area of particular concern to parents buying diapers for their children is the presence or absence of per- and polyfluoroalkyl substances ("PFAS").

8.      PFAS are a group of over 10,000 synthetic chemicals manufactured by humans and known to be harmful to both humans and the environment.

9.      PFAS are often referred to as "forever chemicals" because they are highly persistent and do not biodegrade.

10.     PFAS chemicals are toxic to humans.

11.     In light of the growing consumer concern surrounding PFAS, a key part of Defendant's marketing is telling consumers that Coterie Diapers are "Free From PFAS" and "PFAS-Free Diapers."

12.     The below is one example of Defendant's PFAS-Free marketing for Coterie Diapers.



13.     In addition to making these broad PFAS-free assertions, Defendant's marketing specifically states that Coterie Diapers were tested and proven to be "free of" or "below detectable" for "nearly 200 chemicals that may be considered toxic or harmful for use, including: … Perfluorinated compounds" (*i.e.* PFAS).

14.     As described more fully below, these representations are but a subset of the statements Defendant makes to consumers touting its products as non-toxic and free of harmful chemicals, including PFAS.

15.     Reasonable consumers, therefore, fairly and reasonably understand that Coterie Diapers are PFAS-free.

16.     Defendant's marketing and labeling statements are false, deceptive, misleading, unfair and unlawful.

17.     In reality, PFAS chemicals are now so ubiquitous in the environment that it is essentially impossible to manufacture, ship and sell a diaper that is entirely PFAS-free. Thus, all Coterie Diapers sold by Defendant are almost certainly contaminated with PFAS.

18.     Independent testing confirmed the existence of multiple PFAS chemicals in Coterie Diapers. The presence of PFAS chemicals in Coterie Diapers confirms that Defendant is not taking the extraordinary measures necessary to sell an actually PFAS-free diaper that conformed to its marketing and labeling.

19.     Upon information and belief, the type of testing Defendant performs on Coterie diapers is not capable of ruling out the presence of all PFAS chemicals. Thus, Defendant did not take the steps necessary to substantiate its claims that Coterie diapers are free of harmful chemicals, including PFAS.

20.     Consumers pay a premium for Coterie Diapers because of Defendant's representations that its products are non-toxic and free of harmful chemicals, including PFAS.

21.     If Defendant had disclosed to consumers, including Plaintiff, that Coterie Diapers in fact contained PFAS—and was thus not entirely free of harmful chemicals—consumers, including Plaintiff, would not have purchased Coterie Diapers or they would have paid less for them.

22.     Accordingly, consumers, including Plaintiff, did not receive the benefit of their bargain and overpaid for Coterie Diapers.

23.     Plaintiff seeks damages and equitable remedies for herself and for the proposed Class.

## JURISDICTION AND VENUE

24.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d)(2) of the Class Action Fairness Act because: (1) there are 100 or more putative Class Members; (ii) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs; and (iii) there is minimal diversity because Plaintiff and Defendant are citizens of different states.

25.    This Court has personal jurisdiction over Defendant because it is headquartered in this District, has substantial aggregate contacts with this District, including engaging in conduct that has a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, and purposely availed itself of the laws of the United States and the State of New York.

26.    In accordance with 28 U.S.C. § 1391, venue is proper in this District because Defendant's principal place of business in this District, a substantial part of the events or omissions giving rise to the claims at issue occurred in this District and because Defendant is subject to the personal jurisdiction of this Court.

## PARTIES

27.    Plaintiff Roz Saedi is a resident and citizen of Los Angeles, California. As described more fully below, Plaintiff was exposed to and relied upon Defendant's marketing and labeling messages that Coterie Diapers were entirely free of harmful chemicals, including PFAS, and purchased Coterie Diapers for use on her child during the relevant time period.

28.    Defendant Coterie Baby, Inc. is a Delaware corporation with its principal place of business located at 160 Varick Street, New York, New York 10013.

## FACTUAL ALLEGATIONS

29.     Plaintiff brings this action on behalf of herself and all persons similarly situated who purchased Coterie Diapers. Plaintiff seeks redress individually and on behalf of those similarly situated for economic losses stemming from the purchase of Coterie Diapers. Plaintiff seeks damages and equitable remedies for herself and for the proposed Class.

### PFAS Chemicals

30.     One area of particular concern to consumers of diaper products, which are typically purchased by parents for use on infants and small children, is the presence or absence of harmful chemicals, including PFAS.

31.     Indeed, the potential presence of harmful chemicals, including PFAS, is so material to consumers of diaper products that Defendant dedicates a substantial portion of its marketing, and a material portion of its packaging, to representing that Coterie Diapers are free of harmful chemicals, including PFAS.

32.     PFAS are a group of over 10,000 synthetic chemicals manufactured by humans.[1]

33.     PFAS are commonly referred to as "forever chemicals," meaning they are highly persistent and do not biodegrade or naturally break down in the environment.[2]

---

[1]     *Nat'l Inst. of Env't Health Sciences, Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS)*, Nat'l Insts. of Health U.S. Dept. of Health and Human Servs. ("NIH"), https://www.niehs.nih.gov/health/topics/agents/pfc/index.cfm (last visited Oct. 24, 2023) ("PFAS are a group of nearly 15,000 synthetic chemicals"); Elsie M. Sunderland, et al., *A review of the pathways of human exposure to poly- and perfluoroalkyl substances (PFASs) and present understanding of health effects*, 29 J. Expo Sci. Environ. Epidemiol, 131-47 (2019), DOI: 10.1038/s41370-018-0094-1 (PFAS "manufactured by humans").

[2]     NIH, *supra* at n.1 ("PFAS remain in the environment for an unknown amount of time"); *infra*, *Per- and Polyfluoroalkyl Substances (PFAS)*, FAQs, at n.13 ("All PFAS contain carbon-fluorine bonds—one of the strongest in nature—making them highly persistent in the environment and in our bodies").

34.     PFAS chemicals are known to be harmful to the environment and to humans.[3]

35.     On October 18, 2021, underscoring the gravity of the PFAS threat, the Biden-Harris Administration announced "accelerated efforts to protect Americans from per- and polyfluoroalkyl substances (PFAS), which can cause severe health problems and persist in the environment once released, posing a serious threat across rural, suburban, and urban areas."[4]

36.     While there are thousands of PFAS chemicals in existence, they are all categorized as either "long-chain" or "short-chain" based on the amount of carbon atoms they contain. Long-chain PFAS chemicals contain more than 8 carbon atoms, while any PFAS chemicals containing less than 8 carbon atoms are considered short-chain.

37.     Two common types of long-chain PFAS are perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS").

38.     In 2016, the National Toxicology Program of the United States Department of Health and Human Services ("NTP") and the International Agency for Research on Cancer

---

[3]    *Id*.; *See also* Abrahm Lustgarten, et al., *Suppressed Study: The EPA Underestimated Dangers of Widespread Chemicals*, InDepthNH.org (June 201 2018), https://indepthnh.org/2018/06/21/suppressed-study-the-epa-underestimated-dangers-of-widespread-chemicals/; Linda S. Birnbaum, *The Perils of PFAS*, Gillings School of Public Health, UNC, (Feb. 12, 2021), https://sph.unc.edu/wp-content/uploads/sites/112/2019/08/The-Perils-of-PFAS-UNC-Final-2.12.21.pdf; *Toxicological Profile for Perfluoroalkyls*, Agency for Toxic Substances and Disease Registry, https://wwwn.cdc.gov/TSP/ToxProfiles/ToxProfiles.aspx?id=1117&tid=237 (last visited Oct. 24, 2023); Nicholas J. Herkert, et. al., "Characterization of Per- and Polyfluorinated Alkyl Substances Present in Commercial Anti-fog Products and Their In Vitro Adipogenic Activity," *Environ. Sci. Technol.* 2022, 56, 1162-1173, 1162 ("PFAS have been shown to have a number of toxicological effects in laboratory studies and have been associated with thyroid disorders, immunotoxic effects, and various cancers in epidemiology studies."); Harvard T.H. Chan Sch. Of Pub. Health, *Health risks of widely used chemicals may be underestimated* (June 27, 2018), https://www.hsph.harvard.edu/news/hsph-in-the-news/pfas-health-risks-underestimated/ (last viewed Oct. 24, 2023).

[4]    FACT SHEET: Biden-Harris Administration Launches Plan to Combat PFAS Pollution, The White House, (Oct. 18, 2021); https://bit.ly/3DZvZba.

("IARC") both released extensive analyses of research regarding the adverse effects of fluorochemicals. The NTP concluded that both PFOA and PFOS are presumed to be an immune hazard to humans.[5]

39.     The United States Environmental Protection Agency ("EPA") has also recognized the health risks associated with exposure to PFOA and PFOS. In 2016, the EPA established its first health advisory level ("HAL") for combined PFOS and PFOA in drinking water at 70 ppt.[6] In June of 2022, the EPA introduced new interim health advisories which significantly lowered the HAL for PFOS and PFOA. The 2022 HAL for PFOA is .004 ppt and for PFOS is .02 ppt.[7] In setting these new interim HALs, the EPA relied on "data and draft analyses that indicate that the levels at which negative health effects could occur are much lower than previously understood when the agency issued its 2016 health advisories for PFOA and PFOS."[8] On March 14, 2023, the EPA proposed a new National Primary Drinking Water Regulation ("NPDWR") that would set the enforceable maximum containment levels ("MCL") for PFOA and PFOS in drinking water at 4.0 ppt.[9] The EPA proposed setting the nonenforceable MCL goal for PFOA and PFOS at zero

---

[5]     *See* U.S. Dep't of Health and Human Servs., Nat'l Toxicology Program, NTP Monograph: Immunotoxicity Associated with Exposure to Perfluorooctanoic Acid or Perfluorooctane Sulfonate (Sept. 2016), at 1, 17, 19, available at https://ntp.niehsnih.gov/ntp/ohat/pfoa_pfos/pfoa_pfosmonograph_508.pdf.

[6]     Lifetime Health Advisories and Health Effects Support Documents for Perfluorootanic Acid and Perfluorooctane Sulfonate, 81 Fed. Reg. 101, 33250 (May 25, 2016).

[7]     Lifetime Drinking Water Health Advisories for Four Perfluoroalkyl Substances, 87 Fed. Reg. 118, 36848, 36849 (June 21, 2022).

[8]     *Id.*

[9]     EPA Fact Sheet, *EPA's Proposal to Limit PFAS in Drinking Water* (Mar. 2023), at 1, available at                         https://www.epa.gov/system/files/documents/2023-04/Fact%20Sheet_PFAS_NPWDR_Final_4.4.23.pdf..

because there is no dose of either chemical that is considered safe.[10] However, the MCL was set at 4.0 ppt because that is the lowest reliable detection rate for these chemicals under currently available technology. On September 6, 2022, the EPA also initiated a proposed rulemaking to designate PFOA and PFOS as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA").[11] In support of this rulemaking, the EPA stated that "evidence indicates that these chemicals may present substantial danger to public health or welfare or the environment when released into the environment."[12]

40.     On April 10, 2024, the EPA issued the final rules.[13]

41.     Long-chain PFAS chemicals, like PFOA and PFOS, have been phased out of use in the United States and Europe due to their toxicity to humans and the environment.

42.     Certain industries have continued to use short-chain PFAS chemicals.

43.     Short-chain PFAS chemicals pose similar health and environmental risks as long-chain PFAS chemicals—including bioaccumulation and adverse human health consequences.[14]

---

[10]   Pre-Publication Federal Register Notice: PFAS National Primary Drinking Water Regulation Rulemaking (Mar. 2023), at 2, available at https://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas.

[11]   Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances, 87 Fed. Reg. 171, 54415 (Sept. 6, 2022).

[12]   *Id.* at 54417.

[13]   *Biden-Harris Administration Finalizes First-Ever National Drinking Water Standard to Protect 100M People from PFAS Pollution*, EPA (Apr. 10, 2024), https://www.epa.gov/newsreleases/biden-harris-administration-finalizes-first-ever-national-drinking-water-standard; Per- and Polyfluoroalkyl Substances (PFAS) Final PFAS National Primary Drinking Water Regulation, https://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas

[14]   Cheryl Hogue, *Short-chain and long-chain PFAS show similar toxicity, US National Toxicology Program says*, Chemical & Engineering News, August 24, 2019,

44.     All PFAS, including both long- and short-chain PFAS, contain carbon-fluorine bonds—one of the strongest in nature—which makes them highly persistent in human bodies and in the environment.[15]

45.     The U.S. Department of Health and Human Services' National Toxicology Program found that short-chain PFAS have the same adverse effects as their long-chain counterparts.[16]  Their 2019 study found that both long and short-chain PFAS affected the same organ systems, with the greatest impact seen in the liver and thyroid hormone.[17]

46.     PFAS are harmful chemicals.

47.     PFAS are toxic to humans, even at very low levels.[18]

---

https://cen.acs.org/environment/persistent-pollutants/Short-chain-long-chain-PFAS/97/i33;   *Per- and Polyfluoroalkyl Substances (PFAS)*, NATIONAL TOXICOLOGY PROGRAM, https://ntp.niehs.nih.gov/whatwestudy/topics/pfas/index.html (last visited Oct. 24, 2023).  *See also* Sunderland, *supra* at n.8 ("Lessons learned from legacy PFASs indicate that limited data should not be used as a justification to delay risk mitigation actions for replacement PFASs").

[15]  *Per-   and   Polyfluoroalkyl   Substances   (PFAS)*, *supra* at n.20.

[16]  *Id*.

[17]  *Id*.

[18]  Abrahm Lustgarten, et al., *Suppressed Study: The EPA Underestimated Dangers of Widespread   Chemicals*,   InDepthNH.org   (June   201   2018), https://indepthnh.org/2018/06/21/suppressed-study-the-epa-underestimated-dangers-of-widespread-chemicals/; Linda S. Birnbaum, *The Perils of PFAS*, Gillings School of Public Health, UNC, (Feb. 12, 2021), https://sph.unc.edu/wp-content/uploads/sites/112/2019/08/The-Perils-of-PFAS-UNC-Final-2.12.21.pdf; *Toxicological Profile for Perfluoroalkyls*, Agency for Toxic Substances   and   Disease   Registry, https://wwwn.cdc.gov/TSP/ToxProfiles/ToxProfiles.aspx?id=1117&tid=237 (last visited Oct. 24, 2023).

48.     Indeed, "PFAS have been shown to have a number of toxicological effects in laboratory studies and have been associated with thyroid disorders, immunotoxic effects, and various cancers in epidemiology studies."[19]

49.     Even very small doses of PFAS have been linked to cancer, reproductive and immune system harm and other diseases.[20]

50.     A figure from the European Environmental Agency shows the "effects of PFAS on human health."[21]



---

[19]    Nicholas J. Herkert, et. al., "Characterization of Per- and Polyfluorinated Alkyl Substances Present in Commercial Anti-fog Products and Their In Vitro Adipogenic Activity," *Environ. Sci. Technol.* 2022, 56, 1162-1173, 1162.  *See also* Harvard T.H. Chan Sch. Of Pub. Health, *Health risks of widely used chemicals may be underestimated* (June 27, 2018), https://www.hsph.harvard.edu/news/hsph-in-the-news/pfas-health-risks-underestimated/ (last viewed Oct. 24, 2023).

[20]    https://www.ewg.org/news-insights/news/study-pfas-exposure-through-skin-causes-harm-similar-ingestion (last visited November 7, 2023).

[21]    *Emerging chemical risks in Europe — 'PFAS'*, EUROPEAN ENVIRONMENT AGENCY (Dec. 12, 2019, last modified May 25, 2023), https://www.eea.europa.eu/publications/emerging-chemical-risks-in-europe.

51.    A 2020 New York Times article discussed the effect of PFAS exposure to pregnant women and babies, explaining the effects of PFAS on metabolism and immunity:

> [s]cientists think these widely used industrial chemicals may harm pregnant women and their developing babies by meddling with gene regulators and hormones that control two of the body's most critical functions: metabolism and immunity.  'And while we understandably focus on highly contaminated communities,' Dr. Lanphear said, 'we can predict, based upon all the other evidence, that there's **unlikely to be any safe level**.'

[Emphasis added].[22]

52.    Humans can be exposed to PFAS in a variety of ways, including ingestion, inhalation, and skin absorption.[23]

53.    PFAS exposure through the skin causes harm similar to ingestion.[24]

54.    Humans can be exposed to PFAS by using products containing PFAS.[25]

55.    PFAS in diapers can expose users of the diapers to PFAS.

56.    "The Madrid Statement," a scientific consensus regarding the persistence and potential for harm of PFAS substances issued by the Green Science Policy Institute and signed by more than 250 scientists from 38 countries, recommended the following actions in order to mitigate future harm: (1) discontinuing use of PFAS where not essential or safer alternatives exist; (2)

---

[22]    Liza Gross, *These Everyday Toxins May Be Hurting Pregnant Women and Their Babies*, The New York Times, (Sept. 23, 2020), https://www.nytimes.com/2020/09/23/parenting/pregnancy/pfas-toxins-chemicals.html.

[23]    *Per- and Polyfluoroalkyl Substances (PFAS)*, *supra* at n.20.

[24]    https://www.ewg.org/news-insights/news/study-pfas-exposure-through-skin-causes-harm-similar-ingestion (last visited November 7, 2023).

[25]    https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas (last visited November 6, 2023).

labeling products containing PFAS; and (3) encouraging retailers and individual consumers to avoid products containing or manufactured using PFAS whenever possible.[26]

### Defendant's Products & Representations

57.     Coterie Diapers are a type of absorbent underwear used on infants and small children who are not yet toilet-trained.

58.     Below is an image of Coterie Diapers from Defendant's website:



59.     According to Defendant, Coterie Diapers are "[a] faster wicking, highly absorbent diaper with cleaner, more sustainable ingredients."

60.     According to Defendant, Coterie Diapers are highly absorbent and can be worn by an infant or small child for up to 12 hours at once.

---

[26]     *The Madrid Statement*, GREEN SCIENCE POLICY INSTITUTE, https://greensciencepolicy.org/our-work/science-policy/madrid-statement/ (last visited Oct. 24, 2023).

61.     Defendant is aware of the demand for non-toxic diaper products that are free from harmful chemicals, including PFAS.

62.     Defendant markets Coterie Diapers across a variety of platforms, including but not limited to, online and social media advertisements.

63.     Defendant markets Coterie Diapers as non-toxic and free from harmful chemicals, including PFAS.

64.     The package that Coterie Diapers come in states that "all components are independently lab-tested and proven to be free from harmful chemicals."

65.     Defendant's marketing claimed that "[i]f any chemical may be considered toxic, or is associated with health risks, you won't find it in our diaper."

66.     With respect to PFAS in particular, Defendant's marketing broadly claimed that Coterie Diapers are "PFAS-Free" and "Free From PFAS."

67.     The below is one example of Defendant's PFAS-Free marketing for Coterie Diapers.



68.     Defendant's flagship website, www.coterie.com, states that Coterie Diapers were tested and "proven to be free of [or] below detectable … levels … for nearly 200 chemicals that may be considered toxic or harmful for use, including … Perfluorinated compounds."

**The Impossibility Of Defendant's Claims.**

69.     Decades of PFAS use in industry has resulted in widespread PFAS contamination worldwide.

70.      PFAS are now ubiquitous in the environment, present from the far reaches of the arctic to urban rainwater.

71.     Scientists have estimated that, given the widespread use of PFAS and their ubiquitous presence in the environment, almost everyone on the planet has PFAS in their blood at some level.

15

72.     In 1997, when a PFAS manufacturer sought "clean blood samples" to compare to PFAS-tainted samples, the only source of "clean blood" (free of PFAS contamination) was the "preserved blood of soldiers who died in the Korean War, before [PFAS] products spread worldwide."[27]

73.     PFAS are so pervasive in the environment that a 2022 study by researchers at Yale University found that, due to the ubiquitous presence of PFAS in the air and on surfaces, the chemicals were widely present in the dust collecting in homes and commercial buildings.[28]

74.     In light of the ubiquity of PFAS in the environment, it is essentially impossible to manufacture, ship and sell a diaper that is entirely free of PFAS.

**Laboratory Testing Identified PFAS In Coterie Diapers.**

75.     In February 2024, a Coterie Diaper was tested by an independent, third-party laboratory to determine whether it contained PFAS chemicals.

76.     The method used in the testing is the industry standard for identifying PFAS compounds in consumer products, like Coterie Diapers.

77.     The independent testing identified multiple PFAS chemicals in the Coterie Diaper, including the perfluorinated compound Perfluoropropionic Acid.

78.     These test results show that Defendant is not taking the extraordinary measures required to manufacture, ship and sell an actually PFAS-free diaper.

79.     On information and belief, during the relevant time period, Coterie Diapers were manufactured similarly and in the same facilities.

---

[27]     *Poisoned Legacy*, Environmental Working Group (May 1, 2015), https://www.ewg.org/research/poisoned-legacy.

[28]     Tina Savvaides *et al*, Prevalence and Implications of Per- and Polyfluoroalkyl Substances (PFAS) in Settled Dust, *Current Environmental Health Reports* (2021).

80.     On information and belief, the Coterie Diaper subject to the independent testing was manufactured similarly and in the same facilities as the Coterie Diapers purchased by Plaintiff and the Class members.

**Defendant's Packaging & Marketing Is False, Deceptive and Unfair.**

81.     The presence of PFAS in Coterie Diapers is inconsistent with Defendant's packaging and marketing claims,  as described above.

82.     The package that Coterie Diapers come in states that "all components are … free from harmful chemicals." That claim is false, deceptive and unfair because Coterie Diapers contain harmful PFAS chemicals.

83.     Defendant's website states that Coterie Diapers are "free of [or] below detectable … levels … for nearly 200 chemicals that may be considered toxic or harmful for use, including … Perfluorinated compounds." That claim is false, deceptive and unfair because Coterie Diapers contain chemicals that are considered toxic and harmful for use, including perfluorinated compounds.

84.     Defendant's social media marketing claimed that "[i]f any chemical may be considered toxic, or is associated with health risks, you won't find it in our diaper."  That claim is false, deceptive and unfair because Coterie Diapers contain PFAS chemicals.

85.     Defendant's online marketing claimed that Coterie Diapers are "PFAS-Free" and "Free From PFAS." That claim is false, deceptive and unfair because Coterie Diapers contain PFAS chemicals.

**Defendant Did Not Substantiate Its Claims**

86.     There are over 10,000 PFAS chemicals in existence.

87.     The type of testing Defendant performed on Coterie Diapers is not capable of ruling out the presence of all PFAS chemicals.

88.     As a result, Defendant had no basis for the marketing claims described above.

## Economic Injury

89.     No reasonable consumer would expect that a product line marketed with the claims described above would in fact contain PFAS.

90.     No reasonable consumer would have purchased, or paid as much, for Coterie Diapers had they known the Products contained harmful chemicals linked to adverse health effects in humans.

91.     Plaintiff and members of the Class were injured economically when they purchased Coterie Diapers, including because they (a) did not receive the benefit of their bargain, and instead purchased Coterie Diapers that contained PFAS and was therefore not free from harmful chemicals, including PFAS, and (b) paid a higher purchase price than they would have paid had the presence of PFAS been disclosed.

92.     As alleged herein, Plaintiff and members of the Class received something worth less than what they paid for and did not receive the benefit of their bargain. They paid for diapers were free of harmful chemicals, including PFAS, but they did not receive diapers that were free of harmful chemicals, including PFAS.

93.     Accordingly, Plaintiffs and members of the Class were harmed and suffered actual damages, including economic losses.

## Plaintiff's Experience

94.     Plaintiff has a subscription under which Defendant delivers Coterie Diapers to Plaintiff every four weeks.  Plaintiff received a packaged in March 2024 direct from Coterie.

Plaintiff was exposed to Defendant's marketing prior to purchasing Coterie Diapers, and, in deciding to purchase the product, relied on Defendant's representations that Coterie Diapers were entirely free of harmful chemicals, including PFAS.  Plaintiff was willing to pay the price she paid for Coterie Diapers because she believed they were entirely free of harmful chemicals, including PFAS.  Prior to her purchase, Defendant never disclosed to Plaintiff that Coterie Diapers contained PFAS chemicals, and was therefore not entirely free of harmful chemicals.  If Plaintiff had been aware of the presence of harmful chemicals, including PFAS, in Coterie Diapers, she would not have purchased the Products or would have paid significantly less for the Products. Therefore, Plaintiff was overcharged for Coterie Diapers and did not receive the benefit of her bargain.  As a result of Defendant's conduct, Plaintiff has incurred damages, including economic damages.

### Defendant's Knowledge, Misrepresentations, Omissions, and Concealment of Material Facts Deceived Plaintiffs and Reasonable Consumers

95.    Defendant is aware of consumer demand for diapers that are free from ingredients suspected or known to cause harm to humans and the environment, which is why it has consistently marketed Coterie Diapers as free from harmful chemicals, including PFAS.

96.    At all times relevant to this action, Defendant knew, or at minimum should have known, that Coterie Diapers contain PFAS.

97.    Defendant has engaged in deceptive, untrue, and misleading advertising by making false and unsubstantiated representations regarding the absence of harmful chemicals, including PFAS, in Coterie Diapers.

98.    Defendant made those representations without disclosing to consumers that the Products contain PFAS chemicals.

99.    Additionally, although Coterie Diapers were found to contain PFAS, nothing on the Products' advertising otherwise insinuates, states, or warns that the Products contain PFAS.

100.     Rather, to capitalize on increasing consumer demand for diapers that are free from harmful chemicals, including PFAS, Defendant has knowingly and willfully deployed a concerted strategy to distinguish its Products from competing options in the highly competitive diaper market by representing Coterie Diapers as entirely free of harmful chemicals, including PFAS.

101.     Throughout the class period, Defendant has targeted concerned parents by falsely and misleadingly representing that the Products are entirely free of harmful chemicals, including PFAS.

102.     Defendant's strategy to stay aligned with consumer preferences in order to retain a competitive advantage in the marketplace would be negatively impacted if it disclosed the presence of PFAS in its Products.

103.     Consumers lack the expertise to ascertain the true composition of the Products prior to purchase. Accordingly, reasonable consumers must and do rely on Defendant to market its Products accurately and honestly.

104.     Consumers reasonably relied on Defendant's false statements and misleading representations, and reasonably expected that Defendant's Products would conform with its representations and, as such, would be entirely free of harmful chemicals, including PFAS.

105.     Defendant's false statements, misleading representations and material omissions are intentional, or, at a minimum, entirely careless.

106.     If Defendant had disclosed to Plaintiff and members of the Class that its Products contained PFAS chemicals, Plaintiff and members of the Class would not have purchased the Products or they would have paid less for them.

107.     Plaintiff and members of the Class were among the intended recipients of Defendant's deceptive representations and omissions described herein.

108.    Defendant's representations and omissions, as described herein, are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

109.    The materiality of the representations described herein also establishes causation between Defendant's conduct and the injuries Plaintiff and members of the Class sustained.

110.    Defendant is aware that consumers are concerned about the presence of harmful chemicals, including PFAS, in diapers, yet it has continued to market its Products as entirely free from harmful chemicals, including PFAS, order to profit off of unsuspecting consumers, including Plaintiff and members of the Class.

111.    The presence of PFAS chemicals in the Products is entirely inconsistent with Defendant's representations.

112.    Defendant's false, deceptive and misleading representations had the intended result of convincing reasonable consumers that its Products are entirely free from harmful chemicals, including PFAS.

113.    Defendant's false, misleading, and deceptive representations, as described herein, are likely to continue to deceive and mislead reasonable consumers and the general public. Indeed, they have already deceived and misled Plaintiff and members of the Class.

114.    In making the false, misleading, and deceptive representations, Defendant knew and intended consumers would pay a premium for the Products over comparable products that are not marketed as entirely free of harmful chemicals, including PFAS.

115.    When Plaintiff purchased the Products, Plaintiff did not know, and had no reasonable means of discovering, that Coterie Diapers contained harmful chemicals, including PFAS.

116.    Plaintiff and members of the Class all paid money for the Products. However, they did not obtain the full value of the advertised Product due to Defendant's misrepresentations and omissions as detailed herein. Plaintiffs and members of the Class purchased, purchased more of, or paid more for, the Product than they would have had they known the truth that Coterie Diapers contained harmful chemicals, including PFAS. Thus, Plaintiff and members of the Class have suffered injury in fact and lost money or property as a result of Defendant's wrongful conduct.

117.    If Defendant had disclosed to Plaintiffs and members of the Class that the Product contained PFAS, Plaintiffs and members of the Class would not have purchased the Product or they would have paid less for it.

**TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS**

118.    Defendant made, and continues to make, affirmative misrepresentations to consumers that the Products are entirely free from harmful chemicals, including PFAS.

119.    Defendant concealed material facts that would have been important to Plaintiff and members of the Class in deciding whether to purchase the Product.

120.    On information and belief, Defendant was on notice that the testing it relied on in support of the representations described herein was limited and incapable of determining whether Coterie Diapers were, in fact, PFAS-free.

121.    Defendant did not disclose that the testing it relied on in support of those statements was limited and not capable of determining whether or not the Products were PFAS-free.

122.    Defendant did not disclose to consumers that the Products in fact contain PFAS.

123.    Defendant's concealment deceived reasonable consumers, including Plaintiff and members of the Class. Accordingly, Plaintiffs and members of the Class reasonably relied upon

Defendant's concealment of these material facts and suffered injury as a proximate result of that justifiable reliance.

124.    The PFAS in Coterie Diapers was not reasonably detectible to Plaintiff and members of the Class.  Accordingly, Plaintiffs' and Class member's lack of awareness was not attributable to a lack of diligence on their part.

125.    As a result of Defendant's active concealment of the PFAS and/or failure to inform Plaintiff and members of the Class of the PFAS, any and all statutes of limitations otherwise applicable to the allegations herein have been tolled.

## **PRE-SUIT NOTICE**

126.    All conditions precedent to the claims asserted herein have occurred or been performed.

127.    Prior to the filing of this complaint, Plaintiff put Defendant on written notice of her warranty and consumer protection claims. Defendant did not respond.

## **CLASS ACTION ALLEGATIONS**

128.    Plaintiff brings this action individually and as representatives of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on behalf of two proposed classes defined as follows:

> **Nationwide Class:** During the fullest period allowed by law, all persons residing in the United States who purchased Coterie Diapers.

> **California Subclass**: During the fullest period allowed by law, all persons residing in California who purchased Coterie Diapers.

Specifically excluded from these definitions are: (1) Defendant, any entity in which Defendant has a controlling interest, and its legal representatives, officers, directors, employees, assigns and

successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel.

129.    The claims of all Class members derive directly from the same false and misleading statements and omissions. This case is about the responsibility of Defendant for its Products, and the affirmative misrepresentations and concealment/omissions Defendant made with respect to its Products. Defendant engaged in uniform and standardized conduct toward the Classes, and did not differentiate, in degree of care or candor, in the content of its statements and omissions among individual Class Members. The objective facts are the same for all Class Members. Within each cause of action asserted by the respective Classes, the same legal standards govern, including because, with respect to Plaintiff's warranty and unjust enrichment claims, many states share the same legal standards and elements of proof, facilitating the certification of a nationwide or multi-state class for those claims.

130.    This class action is brought pursuant to Rule 23(b)(2) because Defendant has acted or refused to act on grounds generally applicable to all the members of the Classes, thereby making final injunctive relief or declaratory relief concerning the Classes appropriate.

131.    This class action is also brought pursuant to Rule 23(b)(3) because the questions of law or fact common to the claims of Plaintiff and members of the Classes predominate over any question of law or fact affecting only individual class members and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

132.    A nationwide class is properly certified in New York because Defendant is headquartered in New York and the majority of the conduct and facts that form the basis for Plaintiffs' claims took place in and/or emanated from New York.

133.     **Numerosity**. Class members are so numerous and geographically dispersed that joinder of all Class members is impracticable. While the exact number of Class Members remains unknown at this time, upon information and belief, there are tens of thousands of putative Class members. Moreover, the number of members of the Classes may be ascertained from Defendant's books and records. Individual joinder of all Class members is impracticable. The number of Class members is sufficiently numerous to make class action status the most practical method for Plaintiff to secure redress for injuries sustained and to obtain class wide abatement relief.

134.     **Typicality.** Plaintiff's claims are typical of those of the absent Class members in that Plaintiff and the Class members each purchased the Products and each sustained damages arising from Defendant's wrongful conduct, as alleged more fully herein. Plaintiff shares the aforementioned facts and legal claims or questions with putative members of the Classes. Plaintiff and all members of the putative Classes have been similarly affected by Defendant's common course of conduct alleged herein. Plaintiff and all members of the putative Classes sustained monetary and economic injuries including, but not limited to, ascertainable loss arising out of Defendant's actions, and misrepresentations and omissions regarding the Products. The damages of each member of the Classes were caused directly by Defendant's wrongful conduct in violation of the law as alleged herein.

135.     **Common Questions of Law and Fact Predominate**. Common questions of law and fact exist for all Class Members and predominate over any questions affecting only individual Class Members. These common legal and factual questions include, but are not limited to, the following:

a. Whether Defendant is taking the extraordinary measures necessary to manufacture, ship and sell Coterie Diapers that are entirely free from harmful chemicals, including PFAS;

b. Whether the Products are entirely free from harmful chemicals, including PFAS;

c. Whether the Products are, in fact, PFAS-free given that they contain PFAS;

d. Whether the marketing messages described herein were false, deceptive, misleading, unfair or otherwise unlawful;

e. Whether Defendant's practices in marketing the Products tends to deceive or mislead reasonable consumers into believing that the Products are entirely free from harmful chemicals, including PFAS;

f. Whether Defendant omitted or failed to disclose material information to Plaintiffs and Class Members regarding the Products;

g. Whether Defendant concealed from and/or failed to disclose to Plaintiffs and Class Members that the Products in fact contain harmful chemicals, including PFAS;

h. Whether Defendant breached the implied warranty of merchantability relating to the Products;

i. Whether Defendant breached express warranties relating to the Products;

j. Whether Defendant was negligent in its failure to adequately test the Products;

k. Whether Defendant engaged in unfair, unconscionable, or deceptive trade practices by selling and/or marketing the Products;

l.  Whether Defendant engaged in false or misleading advertising by selling and/or marketing the Products containing harmful chemicals;

m.  Whether Plaintiffs and Class Members are entitled to damages, including compensatory, exemplary, and statutory damages, and the amount of such damages;

n.  Whether Plaintiffs and the other Class Members have been injured and the proper measure of their losses as a result of those injuries; and

o.  Whether Plaintiffs and the other Class Members are entitled to injunctive, declaratory, or other equitable relief.

136.  **Adequacy.** Plaintiff will fairly and adequately protect the interests of the Classes. By prevailing on her own claims, Plaintiff will establish Defendant's liability to all Class members. Plaintiff's counsel is unaware of any conflicts of interest between Plaintiff as class representative and absent Class members with respect to the matters at issue in this litigation. Plaintiff will vigorously prosecute the suit on behalf of the Classes. Plaintiff has retained counsel with substantial experience in handling complex commercial and class action litigation. Plaintiff and her counsel are committed to the vigorous prosecution of this action.

137.  **Insufficiency of Separate Actions.** Absent a class action, Plaintiff and members of the Classes will continue to suffer the harm described herein, for which they would have no remedy. Even if individual consumers could bring separate actions, the resulting multiplicity of lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated consumers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendant.

138.    **Superiority.** A class action is superior to any other available methods for the fair and efficient adjudication of the present controversy for at least the following reasons: (a) the damages suffered by each individual member of the putative Classes do not justify the burden and expense of individual prosecution of the litigation necessitated by Defendant's conduct; (b) even if individual members of the Classes had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed; (c) the claims presented in this case predominate over any questions of law or fact affecting individual members of the Classes; (d) individual joinder of all members of the Classes is impracticable; (e) absent a class action, Plaintiff and members of the putative Classes will continue to suffer harm as a result of Defendant's unlawful conduct; and (f) this action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which Plaintiff and members of the putative Classes can seek redress for the harm caused by Defendant.

139.    **Injunctive/Declaratory Relief**:    The elements of Rule 23(b)(2) are met. Declaratory and injunctive relief is appropriate in this matter. Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described herein, with respect to the Class members as a whole. Unless a class-wide injunction is issued, Defendant will continue to advertise, market, promote, and sell the Products in an unlawful and misleading manner, as described throughout this Complaint, and members of the Classes will continue to be misled, harmed, and denied their rights under the law. If Defendant is allowed to continue the practices described herein, unless injunctive or declaratory relief is granted, Plaintiff and the Classes will not have a plain, adequate, speedy, or complete remedy at law to address all of the wrongs alleged

herein. Plaintiff seeks injunctive relief requiring Defendant to cease its unfair, deceptive and unlawful conduct, including the following:

     a.   Undertake an immediate public information campaign to inform consumers the truth about the PFAS, including at the time of sale of the Products;

     b.   Adequately disclose the PFAS to consumers at the time of sale of the Products; and

     c.   Remove the PFAS.

Plaintiff also seeks a declaration that Defendant's marketing, as described herein, was false, deceptive, misleading and unfair.

140.    Plaintiffs and the Classes expressly disclaim any recovery in this action for physical injury resulting from their use of the Products without waiving or dismissing such claims, although injuries suffered as a result of the Products washing off in the water may constitute evidence supporting various claims asserted herein.

141.    Plaintiffs reserve the right to seek certification of Rule 23(c)(4) of common questions related to Defendant's knowledge, conduct, and duties.

### CAUSES OF ACTION

### COUNT I
### BREACH OF EXPRESS WARRANTY
**(On Behalf of Plaintiff and the Nationwide Class or, in the alternative, the California Subclass)**

142.    Plaintiff incorporates by reference and re-alleges each of the preceding paragraphs, as though fully set forth herein.

143.    Plaintiffs and Class Members purchased the Products either directly from Defendant or through retailers.

144.    Defendant is and was at all relevant times a "merchant" under U.C.C. § 2-313, and related State U.C.C. provisions.

145.    In connection with the sale of the Products, Defendant, as the designer, manufacturer, marketer, distributor, and/or seller issued written warranties by representing that the Products were "free of hazardous chemicals" and "PFAS-Free" (and similar claims).

146.    Defendant breached those express warranties by selling Products that were not free of PFAS.

147.    The express written warranties covering the Products were a material part of the bargain between Defendant and consumers. At the time it made these express warranties, Defendant knew reasonable consumers were purchasing the Products because they believed it to be as marketed.

148.    As a direct and proximate cause of Defendant's breach of these express warranties, Plaintiff and the members of the Nationwide Class (or, in the alternative, members of the California Subclass) have been injured and harmed because they would not have purchased Coterie Diapers on the same terms—or at all—if they had known that Coterie Diapers contained PFAS.

149.    All conditions precedent to the claims asserted herein have occurred or been performed.

150.    Prior to the filing of this complaint, Defendant was served with a notice letter. Plaintiff's counsel sent Defendant a letter advising it that it breached an express warranty and demanded that it, among other things, cease and desist from such breaches and make full restitution by refunding the monies received therefrom.

<u>**COUNT II**</u>
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Nationwide Class or, in the alternative, the California Subclass)**

151.    When they purchased Coterie Diapers, Plaintiff and members of the Nationwide Class (or, in the alternative, members of the California Subclass) conferred tangible and material economic benefits upon the Defendant, who readily accepted and retained these benefits.

152.    Plaintiff and the class members would not have purchased Coterie Diapers, or would have paid less for them, had they known about Defendant's misrepresentations, omissions, concealments, and failures to disclose material facts regarding the Products, as described herein. Therefore, Defendant profited from the sale of the Products to the detriment and expense of Plaintiff and the class members.

153.    Defendant appreciated these economic benefits. These benefits were the expected result of the Defendant acting in its pecuniary interest at the expense of its customers. Defendant knew of these benefits because it was aware that its Products were not and could not be entirely free of PFAS at the point of sale to consumers, yet it misled Plaintiff and the class members regarding the nature and quality of the Products while profiting from this deception.

154.    It would be unjust, inequitable, and unconscionable for Defendant to retain these benefits, including because they were procured as a result of the wrongful conduct alleged above.

155.    Plaintiff and the class members are entitled to restitution of the benefits the Defendant unjustly retained and/or any amounts necessary to return Plaintiff and the class members to the position they occupied prior to dealing with Defendant, with such amounts to be determined at trial.

156.    Plaintiff pleads this claim separately as well as in the alternative to her claims for damages under Fed. R. Civ. P. 8(a)(3), because if the Court dismisses Plaintiff's claims for damages or enters judgment on them in favor of the Defendant, Plaintiff will have no adequate legal remedy.

<u>COUNT III</u>
**VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT**
**Cal. Civ. Code §§1750,** *et seq*
**(On Behalf Of Plaintiff and the California Subclass)**

157.    Plaintiff repeats and re-allege the allegations contained in Paragraphs 1-140 above as if fully set forth herein.

158.    This cause of action is brought by Plaintiff individually and on behalf of the California Subclass, pursuant to the California Consumer Legal Remedies Act ("CLRA").

159.    The CLRA prohibits deceptive practices concerning the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

160.    Defendant is a "person" under Cal. Civ. Code §1761(c).

161.    Plaintiff is a "consumer" under Cal. Civ. Code §1761(d), including because she purchased Coterie Diapers primarily for personal, family or household use.

162.    The purchases of Defendant's Products by Plaintiff and members of the California Subclass constitute "transactions" within the meaning of Cal. Civ. Code § 1761(e).

163.    Defendant's Products are "goods" under Cal. Civ. Code § 1761(a).

164.    Defendant, directly and through its agents, employees, and/or subsidiaries, violated the CLRA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the nature, quality, value, and characteristics of the Products, as detailed above.

165.    Defendant's violations of the CLRA occurred repeatedly in its trade or practice—including the distribution, marketing, and/or sale of the Products.

166.    By misrepresenting the Products as "free of hazardous chemicals" and "PFAS-Free" (and similar claims), and/or by failing to disclose and actively concealing that the Products were not in fact free of PFAS, Defendant engaged in one or more of the following unfair or

deceptive business practices as defined in Cal. Civ. Code § 1770(a): (a) representing that the Products had a characteristic that they did not actually have; (b) representing that the Products were of a particular quality, grade, or standard when, in fact, they were not of that quality, grade, or standard; and (c) failing to market, distribute, and sell the Products in accordance with Defendant's previous representations—i.e., that the Products were "free of hazardous chemicals" and "PFAS-Free" and similar representations. Cal. Civ. Code §§ 1770(a)(5), (7), (9), and (16).

167.    Defendant's unfair or deceptive acts or practices, including its misrepresentations, concealments, omissions, and/or suppressions of material facts, were designed to mislead and had a tendency or capacity to mislead and create a false impression in consumers that the Products were "free of hazardous chemicals" and "PFAS-Free" (and similar claims). Defendant's misrepresentations, concealments, omissions, and suppressions of material facts did, in fact, deceive reasonable consumers, including Plaintiff and the other members of the California Subclass, about the true nature, quality, value, and characteristics of the Products.

168.    Defendant intended for Plaintiff and members of the California Subclass to rely on its misrepresentations, omissions, and concealment – which they did by purchasing the Products at the prices they paid believing that the Products were entirely free of PFAS.

169.    Defendant's misrepresentations, concealments, omissions, and suppressions of material facts regarding the Products were material to the decisions of Plaintiff and members of the California Subclass to purchase the Products, as Defendant intended. Plaintiff and the other members of the California Subclass were exposed to those misrepresentations, concealments, omissions, and suppressions of material facts, and reasonably relied on Defendant's misrepresentations that the Products were "free of hazardous chemicals" and "PFAS-Free" (and similar claims) in deciding to purchase the Products. A reasonable consumer would have

considered them important in deciding whether to purchase Coterie Diapers or pay a lesser price. Had they known the truth about the Products, Plaintiff and members of the California Subclass would not have purchased the Products, or would have paid less for them.

170.    Defendant profited from selling the falsely, deceptively, and unlawfully advertised Products to unwary purchasers.

171.    As a direct and proximate result of Defendant's deceptive practices, Plaintiff and members of the California Subclass have sustained economic injury and loss – either by purchasing Products they otherwise would not have purchased or paying more than they otherwise would have as a result of Defendant's actions and omissions alleged above – that first occurred at the time each Product was purchased.

172.    Defendant's violations present a continuing risk to Plaintiff and members of the California Subclass, as well as to the general public, because Defendant continues to falsely label, market and sell the Products as "free of hazardous chemicals" and "PFAS-Free." Defendant's violations present a continuing risk to Plaintiff and members of the California Subclass, as well as to the general public, because the Products do not perform as labeled and marketed, and use of the Products as labeled and marketed results in infants and young children being exposed to PFAS, while their parents are attempting to purchase products that avoid that outcome. Defendant's unlawful acts and practices complained of herein affect the public interest.

173.    Plaintiff and members of the California Subclass timely provided Defendant notice of the issues raised in this count and this complaint and an opportunity to cure. At least thirty days prior to filing this complaint, Plaintiff sent a notice letter pursuant to Cal. Civ. Code §1782 to Defendant.  Because Defendant failed to adequately remedy its unlawful conduct within the

requisite time period, Plaintiff seeks all damages and relief to which Plaintiff and the class members are entitled.

174.     Pursuant to Cal. Civ. Code §1780(a), Plaintiff and the class members seek an order enjoining Defendant's unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the California CLRA.

175.     Under Cal. Civ. Code §1780(b), Plaintiff seeks an additional award against Defendant of up to $5,000 for each class member who qualifies as a "senior citizen" or "disabled person" under the California CLRA.  Defendant knew or should have known that its conduct was directed to one or more class members who are senior citizens or disabled persons.  Defendant's conduct caused one or more of these senior citizens or disabled persons to suffer a loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the senior citizen or disabled persons.  One or more class members who are senior citizens or disabled persons are substantially more vulnerable to Defendant's conduct and each of them suffered substantial economic damage resulting from Defendant's conduct.

<u>COUNT IV</u>
**VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW**
**Business and Professions Code § 17500, *et seq.***
**(On Behalf Of Plaintiff and the California Subclass)**

176.     Plaintiff re-alleges and incorporates the allegations contained in Paragraphs 1-140 above as though fully set forth herein.

177.     This cause of action is brought by Plaintiff individually and on behalf of the California Subclass, pursuant to the California False Advertising Law ("FAL").

178.     Plaintiff, members of the California Subclass, and Defendant are "persons" within the meaning of Cal. Bus. & Prof. Code § 17506.

179.    The California FAL states: "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state . . . in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

180.    Defendant, directly and through its agents, employees, and/or subsidiaries, violated the FAL by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the nature, quality, value, and characteristics of the Products, as detailed above. Defendant's actionable conduct includes misrepresentations, omissions, concealment, and failure to disclose that the Products were not, in fact, "free of hazardous chemicals" and "PFAS-Free" (and similar claims), as they were labeled and/or marketed.

181.    By misrepresenting the Products as "free of hazardous chemicals" and "PFAS-Free" (and similar claims), and/or by failing to disclose and actively concealing that the Products were not free of PFAS, Defendant engaged in untrue and misleading advertising prohibited by California Bus. & Prof. Code § 17500.

182.    Defendant made or caused to be made and disseminated before the public in California, advertising, marketing, labeling, and other publications containing numerous statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known, to be untrue and misleading to consumers, including Plaintiffs and the other members of the California Subclass.

183.    Defendant's unfair or deceptive acts and practices, including its misrepresentations, concealments, omissions, and suppressions of material facts, were designed to mislead and had a tendency or capacity to mislead and create a false impression in consumers that the Products were "free of hazardous chemicals" and "PFAS-Free" (and similar claims). Indeed, those misrepresentations, concealments, omissions, and suppressions of material facts did in fact deceive reasonable consumers, including Plaintiff and members of the California Subclass, about the true nature, quality, value, and characteristics of the Products.

184.    Defendant intended for Plaintiff and other members of the California Subclass to rely on its misrepresentations, omissions, and concealment—which they did by purchasing the Products at the prices they paid believing that the Products were PFAS-free.

185.    Defendant's misrepresentations, concealments, omissions, and suppressions of material facts regarding the nature, quality, value, and characteristics of the Products, and true characteristics thereof, were material to the decisions of Plaintiff and the other members of the California Subclass to purchase Products, as Defendant intended. Plaintiff and the other members of the California Subclass were exposed to those misrepresentations, concealments, omissions, and suppressions of material facts, and reasonably relied on the Defendant's misrepresentations and omissions that the Products were PFAS-free in deciding to purchase the Products.

186.    The fact that the Products are not, in fact, free of PFAS is a material fact that requires disclosure under the FAL.

187.    Defendant did not, and still has not, disclosed to consumers that the Products are not PFAS-free.

188.    Plaintiff and other members of the California Subclass reasonably relied on Defendant's misrepresentations, omissions, and concealment of material facts regarding the

nature, quality, value, and characteristics of the Products by purchasing them and believing they were "free of hazardous chemicals" and "PFAS-Free (and similar claims).

189.    Had Plaintiff and the other members of the California Subclass known the truth about the Products, they would not have purchased them or would have paid less for them.

190.    As alleged herein, Plaintiff and other members of the California Subclass have suffered injury in fact and lost money or property at the time of purchase as a result of Defendant's conduct because they were exposed to and purchased the Products in reliance on the Defendant's false representations that the Products were "free of hazardous chemicals" and "PFAS-Free" when they were in fact not.

191.    Defendant's violations present a continuing risk to Plaintiff and members of the California Subclass, as well as to the general public, because the Products do not perform as labeled and marketed, and use of the Products as labeled and marketed results in infants and young children being exposed to PFAS while their parents are attempting to purchase products that avoid that outcome. Defendant's unlawful acts and practices complained of herein affect the public interest. Such misconduct by Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which it is not entitled. Plaintiff and members of the California Subclass have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein. Thus, injunctive relief enjoining Defendant's deceptive practices is proper.

192.    Plaintiff pleads this claim separately as well as in the alternative to claims for damages under Fed. R. Civ. P. 8(a)(3), because if the Court dismisses Plaintiff's claim for damages or enters judgment on them in favor of Defendant, Plaintiff will have no adequate legal remedy. Plaintiff makes the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in her other causes of action, in the event that such causes of action do not succeed. Plaintiff and the other members of the California Subclass may be unable to obtain monetary, declaratory and/or injunctive relief directly under other causes of action, and will lack an adequate remedy at law, if the Court requires her to show class-wide reliance and materiality beyond the objective reasonable consumer standard applied under the FAL, because Plaintiff may not be able to establish each of the California Subclass member's individualized understanding of Defendant's misleading representations as described in this complaint, but the FAL does not require individualize proof of deception or injury by absent class members. The legal remedies available to Plaintiff are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief. *Am. Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937); *see also United States v. Bluitt*, 815 F. Supp. 1314, 1317 (N.D. Cal. Oct. 6, 1992) ("'The mere existence' of a possible legal remedy is not sufficient to warrant denial of equitable relief."); *Quist v. Empire Water Co*., 2014 Cal. 646, 643 (1928) ("The mere fact that there may be a remedy at law does not oust the jurisdiction of a court of equity. To have this effect, the remedy must also be speedy, adequate, and efficacious to the end in view … It must reach the whole mischief and secure the whole right of the party in a perfect manner at the present time and not in the future."). Additionally, unlike damages, the Court's discretion in fashioning equitable relief is very broad and can be awarded when the entitlement to damages may prove difficult. *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal.4th 163, 177-80 (2000) (restitution under the UCL can be awarded

"even absent individualized proof that the claimant lacked knowledge of the overcharge when the transaction occurred."). Thus, restitution would allow recovery even when normal consideration associated with damages would not. *See, e.g., Fladeboe v. Am. Isuzu Motors Inc.*, 150 Cal. App. 4th 42, 68 (2007) (noting that restitution is available even when damages are unavailable). Furthermore, the standard and necessary elements for a violation of the UCL "unfair" prong and for quasi-contract/unjust enrichment are different from the standard that governs a legal claim.

193.     Plaintiff and the other members of the California Subclass seek (a) a declaration that the above-described practices constitute false, misleading and deceptive advertising, (b) an order enjoining the Defendant's false packaging and advertising, (c) any such orders or judgments as may be necessary to restore to Plaintiff and the other members of the California Subclass any money acquired by unfair competition, including restitution and/or restitutionary disgorgement, and (d) any other just and proper relief available under the false advertising provisions of the California FAL.

**COUNT V**
**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**Business & Professions Code §§17200, *et seq.***
**(On Behalf Of Plaintiff and the California Subclass)**

194.     Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1-140 as if fully included herein.

195.     This cause of action is brought by Plaintiff individually and on behalf of the California Subclass, pursuant to the California Unfair Competition Law, Business & Professions Code §17200, *et seq*.

196.     California's Unfair Competition Law ("UCL") prohibits "unfair [business] competition," including any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

197. **Unlawful Business Practices:** In the course of conducting business, Defendant committed "unlawful" business practices in violation of the UCL by, *inter alia*, making representations that are false, misleading, and deceptive; violating California Civil Code §§1572, 1573, 1709, and 1711; violating the California Legal Remedies Act, California Civil Code §1750, *et seq.*; violating California Business & Professions Code §§ 17200, *et seq.* and 17500, *et seq.*; and violating the consumer protection act of any state in which consumers of the Products reside, and the Commercial Code of any state in which consumers of the Products reside. Plaintiff reserves the right to allege other violations of law, which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

198. **Unfair Business Practices:** In the course of conducting business, Defendant committed "unfair" business acts or practices by, *inter alia*, making the "free of hazardous chemicals" and "PFAS-Free" claims (and similar claims), which are false, misleading, and deceptive. Defendant's conduct concerning the packaging, advertising, and sale of the Products was "unfair" because it was immoral, unethical, unscrupulous, or substantially injurious to consumers and the public at large and the utility of Defendant's conduct, if any, does not outweigh the gravity of the harm to its victims. There is no societal benefit from false advertising, only harm. While Plaintiff and the public at large were and continue to be harmed, Defendant has been unjustly enriched by its false, misleading, and deceptive representations as they unfairly enticed Plaintiff and class members to purchase Coterie Diapers instead of similar diapers sold by other manufacturers that were not advertised falsely as "free of harmful chemicals" and "PFAS-Free." Because the utility of Defendant's conduct (zero) is outweighed by the gravity of harm to Plaintiff, consumers, and the competitive market, Defendant's conduct is "unfair."

199.    **Fraudulent Business Practices:** A statement or practice is "fraudulent" under the UCL if it is likely to mislead or deceive the public, applying an objective reasonable consumer test. In the course of conducting business, Defendant committed "fraudulent business act[s] or practices" and deceptive or misleading advertising by, *inter alia*, making the "free of hazardous chemicals" and "PFAS-Free" representations (and similar claims), which are false, misleading, and deceptive to reasonable consumers, and which Defendant knew or should have known were false, misleading, and deceptive to consumers.

200.    Defendant's unfair or deceptive acts or practices were designed to mislead and had a tendency or capacity to mislead and create a false impression in consumers that the Products were "free of hazardous chemicals" and "PFAS-Free" (and similar claims). Those misrepresentations, concealments, omissions, and suppressions of material facts did, in fact, deceive reasonable consumers, including Plaintiff and other members of the California Subclass, about the true nature, quality, value, and characteristics of the Products, as well as the quality and true value thereof.

201.    Defendant's misrepresentations, concealments, omissions, and suppressions of material facts were material to Plaintiff's and the California Subclass members' decisions in that a reasonable consumer would have considered them important in deciding whether to purchase the Products or pay a lesser price. Plaintiff and the other members of the California Subclass were exposed to Defendant's misrepresentations, concealments, omissions, and suppressions of facts, and reasonably relied on Defendant's misrepresentations, concealment, omission and non-disclosure that the Products were, in fact, PFAS-free.

202.    Had Plaintiff and the other members of the California Subclass known about the true nature of the Products they would not have purchased them or paid less for them.

203.    Defendant profited from selling the falsely, deceptively, and unlawfully advertised Products to unwary purchasers.

204.    Plaintiff and the other members of the California Subclass suffered ascertainable loss as a direct and proximate result of Defendant's unlawful, fraudulent, and unfair business acts and practices.

205.    Defendant's violations present a continuing risk to Plaintiff and members of the California Subclass, as well as to the general public, because the Products do not perform as labeled and marketed, and use of the Products as labeled and marketed results in infants and young children being exposed to PFAS while their parents are attempting to purchase products that avoid that outcome. Defendant's unlawful acts and practices complained of herein affect the public interest. Such misconduct by Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which it is not entitled. Plaintiff and members of the California Subclass have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein. Thus, injunctive relief enjoining Defendant's deceptive practices is proper.

206.    Plaintiff pleads this claim separately as well as in the alternative to claims for damages under Fed. R. Civ. P. 8(a)(3), because if the Court dismisses Plaintiff's claims for damages or enters judgment on them in favor of Defendant, Plaintiff will have no adequate legal remedy. Plaintiff makes the following allegations in this paragraph only hypothetically and as an

alternative to any contrary allegations in her other causes of action, in the event that such causes

of action do not succeed. Plaintiff and the other members of the California Subclass may be unable

to obtain monetary, declaratory and/or injunctive relief directly under other causes of action, and

will lack an adequate remedy at law, if the Court requires her to show class-wide reliance and

materiality beyond the objective reasonable consumer standard applied under the UCL, because

Plaintiff may not be able to establish each of the California Subclass member's individualized

understanding of Defendant's misleading representations as described in this complaint, but the

UCL does not require individualize proof of deception or injury by absent class members. The

legal remedies available to Plaintiff are inadequate because they are not "equally prompt and

certain and in other ways efficient" as equitable relief. *Am. Life Ins. Co. v. Stewart*, 300 U.S. 203,

214 (1937); *see also United States v. Bluitt*, 815 F. Supp. 1314, 1317 (N.D. Cal. Oct. 6, 1992)

("'The mere existence' of a possible legal remedy is not sufficient to warrant denial of equitable

relief."); *Quist v. Empire Water Co*., 2014 Cal. 646, 643 (1928) ("The mere fact that there may be

a remedy at law does not oust the jurisdiction of a court of equity. To have this effect, the remedy

must also be speedy, adequate, and efficacious to the end in view … It must reach the whole

mischief and secure the whole right of the party in a perfect manner at the present time and not in

the future.").  Additionally, unlike damages, the Court's discretion in fashioning equitable relief is

very broad and can be awarded when the entitlement to damages may prove difficult. *Cortez v.

Purolator Air Filtration Prods. Co.*, 23 Cal.4th 163, 177-80 (2000) (restitution under the UCL can

be awarded "even absent individualized proof that the claimant lacked knowledge of the

overcharge when the transaction occurred."). Thus, restitution would allow recovery even when

normal consideration associated with damages would not. *See, e.g., Fladeboe v. Am. Isuzu Motors

Inc.*, 150 Cal. App. 4th 42, 68 (2007) (noting that restitution is available even when damages are

unavailable). Furthermore, the standard and necessary elements for a violation of the UCL "unfair" prong and for quasi-contract/unjust enrichment are different from the standard that governs a legal claim.

207.    Under Bus. & Prof. Code § 17203, Plaintiff and the other members of the California Subclass seek (a) a declaration that the above-described practices constitute false, misleading and deceptive advertising, (b) an order enjoining Defendant's unfair and/or deceptive acts or practices, (c) any such orders or judgments as may be necessary to restore, to Plaintiff and the other class members, any money acquired by unfair competition, including restitution of all monies from the sale of the Products and/or restitutionary disgorgement of all moneys which were unjustly acquired through acts of unlawful competition as provided in Cal. Bus. & Prof. Code § 17203, and (d) any other just and proper relief available under the California UCL.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, respectfully requests that this Court:

A.     Determine that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3), and/or (c)(4), direct that reasonable notice of this action be given to the Classes, appoint Plaintiff as named representative of the Class(es), and appoint Plaintiff's counsel as Class Counsel;

B.     Require Defendant to pay for sending notice to the certified Class(es);

C.     Declare that Defendant's packaging and marketing of the Products was false, deceptive, misleading and unfair;

D.     Enjoin Defendant's unlawful conduct;

E.    Award damages (including actual, nominal, presumed, statutory, and punitive damages as provided by law) and restitution to Plaintiff and the Class(es) in an amount to be determined at trial, plus pre- and post-judgment interest, in accordance with law;

F.    Order disgorgement of Defendant's ill-gotten revenues;

G.    Award attorneys' fees and costs, as allowed by law;

H.    Enter judgment against Defendant and in favor of Plaintiff and the Class(es); and

I.    Provide such further relief as may be just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:  May 20, 2024                    **AVORN LLC**

                                        *s/ Annie Friedman*
                                        Annie Friedman
                                        88 Lefferts Place, #3A
                                        Brooklyn, NY 11238
                                        Tel.: (631) 525-1981
                                        annie@avornlaw.com

                                        Eric S. Dwoskin (*Pro Hac Vice* Forthcoming)
                                        DWOSKIN WASDIN LLP
                                        433 Plaza Real, Suite 275
                                        Boca Raton, FL 33432
                                        Tel.: (561) 849-8060
                                        edwoskin@dwowas.com

                                        *Attorney for Plaintiff and the putative Class*